<pre>
 1                    UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF LOUISIANA
 2                        SHREVEPORT DIVISION


 3


 4   UNITED STATES OF AMERICA        :   CRIMINAL DOCKET
                                     :   No. 11-CR-00062-21
 5   VERSUS                          :
                                     :
 6   ROBERT E. CUFF                  :   01 September 2011
     .. .. .. .. .. .. .. .. .. .. : Shreveport, Louisiana

 7


 8


 9


10   Certified transcript of the proceedings held before the
     Honorable Mark L. Hornsby, United States Magistrate Judge.
11


12


13        INITIAL APPEARANCE, ARRAIGNMENT, DETENTION HEARING


14


15   APPEARANCES:

16   FOR THE GOVERNMENT       AUSA LUKE WALKER
                              U.S. Attorney's Office
17                            300 Fannin Street, Suite 3201
                              Shreveport, Louisiana  71101-3068

18


19   FOR THE DEFENDANT        STEPHEN P. KARNS
                              Law Office of Stephen P. Karns
20                            6116 N. Central Expressway, Suite 450
                              Dallas, Texas 75206

21


22


23   Transcribed by:  Richard Simpson
                       1120 Hallmark Dr.
24                     Shreveport, LA 71118
                       318-688-1860
25   Proceedings recorded by electronic sound recording FTR;
     transcript produced by transcription service.
</pre>

```
 1                         01 SEPTEMBER 2011,

 2                 (Court called to order 2:45 p.m.)

 3              THE COURT:  Thank you.  Be seated please.

 4       Let's see.  Mr. Karns and Mr. Cuff, if you'll come up to

 5   this corner mic here.

 6       Good afternoon, Mr. Walker.

 7              MR. WALKER:  Good afternoon, Your Honor.  We are here

 8   in 11-CR-00062, and he is number 21; United States versus

 9   Robert Cuff, a/k/a DD0040, a/k/a "Slap-a-lot".  We are here for

10   an initial appearance, arraignment, and detention hearing.

11              THE COURT:  All right.  Good afternoon, Mr. Karns.

12              MR. KARNS:  Good afternoon, sir.

13              THE COURT:  Mr. Karns, are you making an oral motion

14   to enroll as retained counsel, or have we already taken care of

15   that on paper before today?

16              MR. KARNS:  We've already taken care of it, sir.

17              THE COURT:  All right.  Very well.

18       Sir, are you Robert E. Cuff?

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  All right.  Let's see.  Mr. Karns, what I

21   would normally do for a defendant making his initial appearance

22   and arraignment here who was here with appointed counsel, I

23   would go over constitutional rights.  Do you wish to waive

24   that?

25              MR. KARNS:  Yes, sir.
```

1          THE COURT:  All right.  Let's go on then to the issue

2   of the arraignment.  I trust you've been provided with a copy

3   of the indictment?

4          MR. KARNS:  Yes, sir.

5          THE COURT:  Are you willing to waive the reading of

6   it?

7          MR. KARNS:  Yes, sir.

8          THE COURT:  And how does Mr. Cuff plead?

9          MR. KARNS:  Not guilty.

10          THE COURT:  All right.  Mr. Cuff, I'm entering your

11   not guilty plea to all of the charges against you in this

12   federal case.

13      Mr. Karns, as we discussed previously in my chambers, I'm

14   going to grant your oral motion for Rule 16 discovery, as well

15   as the Government's right to reciprocal Rule 16 discovery.  You

16   need not, in our court, file written discovery motions in order

17   to get the basic discovery.  It is my belief that the U.S.

18   Attorney is producing very timely for all of the defendants who

19   appear, quite a quantity of discovery materials, and I trust

20   that'll be sufficient.  But if there are any problems at all

21   with discovery as we go forward, all you have to do is call me.

22   You get Mr. Walker on the phone and I'll resolve any problems

23   that you have.  So before you cut down too many trees with

24   paper, pick up the phone and I'll help you get to the bottom of

25   -- you know, if there's something you need or you think is

    1   missing, let me know and we'll take care of it.

    2           MR. KARNS:  Yes, sir.

    3           THE COURT:  All right.  Mr. Cuff, there are 72

    4   defendants in this indictment to date.  We've got about 50 or

    5   so in federal custody.  What that means is that defendants have

    6   been appearing, as you are today, for many months.  And I have

    7   been, for lack of a better word, nursing the case along now for

    8   awhile and setting various deadlines when appropriate.  And --

    9   but there are still other defendants to be taken into custody

   10   and to come before the court.  Some are being arrested at great

   11   distances from our courthouse.  And so what I want to assure

   12   you, and I assured Mr. Karns earlier when we met in my office,

   13   was that there may be times because of the sheer magnitude of

   14   this case and the number of defendants involved, that the case

   15   may at times appear to be moving somewhat slowly.  But I am

   16   doing everything I can, and everybody in this court system is

   17   doing everything they can to move it as quickly as we can; but

   18   we have to give due regard for the rights of the defendants who

   19   have not even yet come in.  We have to give due regard for Mr.

   20   Karns' need to be fully prepared in order to protect your

   21   interest in the case.  So I say that just simply to assure you

   22   that from the court's perspective, we understand the delay and

   23   we're going to do everything we can to move it forward as

   24   quickly as we can.

   25           THE DEFENDANT:  Yes, sir.

1           THE COURT:  All right.  One of the deadlines that

2     I've set, Mr. Cuff, with all the other defendants is:  From

3     time to time, I'll set a status conference and meet with the

4     lawyers.  And the purpose of me doing that is I can make sure

5     Mr. Karns has received everything he needs, see if he's filed

6     any motions.  If we need to set any hearings, we'll do that.

7     And if appropriate, we'll set a trial date at that time.

8           But the date that I had already set before you came into

9     our custody is a status conference date of September 29th at

10    3:00, September 29th at 3:00.  And the clients, the defendants,

11    will not be at that meeting.  It'll just be a meeting that

12    we'll have just with the lawyers.  But I know Mr. Karns will

13    give you a full report about any dates and deadlines that flow

14    from that conference.

15          Let's see.  Mr. Karns, I believe that takes care of

16    everything but the issue of the Government's motion for

17    detention.  I have been provided with quite a number of, I

18    guess I'll call them "letters of reference" that you handed to

19    me in my office.  And I wanted to say that -- on the record

20    that all of that information will be taken into account in

21    making the decision on whether Mr. Cuff is eligible for any

22    kind of bond.

23          And I would ask your permission that even regardless of

24    the outcome of our proceedings today, I would like to put these

25    in the possession of the district judge to whom this case is

1  assigned, Judge Hicks, for whatever further use that he would

2  like to make of it as the case progresses.  Is that acceptable?

3           MR. KARNS:  Yes, sir.

4           THE COURT:  All right.  And I'm not going to file

5  them into the record for confidentiality reasons.  You are

6  welcome to do that if you want.  I don't intend to do that, but

7  I will get them informally into Judge Hicks' possession after

8  we leave here today.  Okay?

9           MR. KARNS:  Yes, sir.

10           THE COURT:  All right.  Anything else, Mr. Karns,

11  that we need to take up other than the issue of bond or

12  detention?

13           MR. KARNS:  No, sir.

14           THE COURT:  Okay.  Mr. Walker, anything else before

15  we move to the detention issue?

16           MR. WALKER:  No, Your Honor.

17           THE COURT:  All right.  Mr. Cuff and Mr. Karns, if

18  you'll have a seat back at counsels table, I'll ask Mr. Walker

19  to call his first witness, please.

20           MR. WALKER:  Your Honor, before we call our first

21  witness, the United States would first ask the Court take

22  notice of the fact that in this case pursuant to Title 18,

23  United States Code, Section 3142, there is a presumption in

24  favor of detention as to each of the counts for which -- all

25  three of the counts for which the defendant is charged.

1                THE COURT:  All right.  And this defendant is also,

2       in addition to the two conspiracy charges he has, the Count 1,

3       he has the enterprise charge?

4                MR. WALKER:  That is correct.

5                THE COURT:  Okay.  All right.  So there's a

6       presumption in favor of detention on each of those because the

7       offenses, the grand jury found probable cause to charge on

8       offenses involving a minor victim?

9                MR. WALKER:  That is correct.  And actually, there is

10      a presumption in favor of detention on all child pornography

11      charges with the exception of possession of child pornography.

12      So distribution, receipt, advertising, and enterprise all carry

13      a presumption in favor of detention.

14               THE COURT:  All right.  Thank you, sir.  You can call

15      your witness.

16               MR. WALKER:  The United States would also ask that

17      the Court take judicial notice of the pretrial services report

18      that has been submitted to all parties.

19               THE COURT:  And, Mr. Karns, did you get a chance to

20      read the report?

21               MR. KARNS:  Yes, sir.

22               THE COURT:  Okay, all right.  It's my -- you see at

23      the top the -- I don't know if you still have your copy of it,

24      but the top of it marks that it's confidential and not to be

25      read by agents and so forth.  So I treat them very delicately

1    and I don't admit them into evidence, but you are welcome to

2    argue and point out to the Court any of the information that --

3    and I've read it; I've read it very thoroughly -- but you are

4    -- even though I'm not going to admit it, for confidentiality

5    concerns, into the record, I'm going to take everything that's

6    in here into account and you're free to point any of it out to

7    the Court that you think's appropriate.

8              MR. KARNS:  Thank you.

9              THE COURT:  All right.

10              MR. WALKER:  And with that, I would call Leslie

11   Williams.

12              THE COURT:  All right.

13         LESLIE WILLIAMS, WITNESS FOR THE GOVERNMENT, SWORN

14                        DIRECT EXAMINATION

15   BY MR. WALKER:

16   Q    Would you tell me your name and your occupation.

17   A    Leslie Williams, special agent with Homeland Security

18   Investigations.

19   Q    And in connection with your employment, are you the case

20   agent on the case that leads us here today for which Robert

21   Cuff has been indicted?

22   A    Yes.

23   Q    Does that case relate to a child exploitation enterprise

24   and Internet bulletin board called Dreamboard?

25   A    Yes.

1   Q    In January of 2010 did we have occasion to execute a

2   search warrant and obtain a copy of that Internet bulletin

3   board?

4   A    Yes.

5   Q    When we obtained the copy of the bulletin board, were

6   there IP addresses on the board, or had they been removed?

7   A    In January of 2010 they had been removed.

8   Q    In January, I'm sorry.

9        And in June of 2010, did we execute a second search

10  warrant and have IP addresses?

11  A    Yes.

12  Q    And were we able to identify Mr. Cuff's IP address by

13  search warrant or by issuing subpoenas to the Internet service

14  providers?

15  A    Yes.

16  Q    That's how we connected him to the board?

17  A    Correct.

18  Q    I next want to talk to you briefly about the board.  And I

19  know the Court has actually e-signed the complaint in this case

20  and he has also signed search warrants in the past, so he is

21  aware of the board.  But for the record, was this a child

22  pornography bulletin board that anybody could join or was there

23  something you had to do in order to be allowed to join the

24  bulletin board?

25  A    It was a private password protected bulletin board.

1    Q     And what did one have to do to gain membership?

2    A     Audition with child pornography to the satisfaction of the

3    administrator, who would then grant them access and membership

4    to the board.

5              THE COURT:  He had to do what to the satisfaction of

6    the administrator?

7              THE WITNESS:  You had to apply with child pornography

8    to the satisfaction of the administrator, and if he liked what

9    you applied with, he would grant you membership with a password

10   and login.

11   BY MR. WALKER:

12   Q     And after you obtained membership to the board, could you

13   then stop posting child pornography or did you have to continue

14   posting?

15   A     Every 50 days you had to post child pornography or be

16   automatically deleted.

17   Q     And were there different areas of the board?

18   A     Yes.

19   Q     Were there some areas of the board where people only

20   posted images of children posing?

21   A     Yes.

22   Q     Were there other sections of the board that were egregious

23   like the PT Vid section of the board?

24   A     Yes.

25   Q     Okay.  And can you tell me generally what the PT Vid

1    section of the board contained?

2    A    It stands for "pre-teen" and it was mostly hard core

3    videos.

4    Q    Hard core videos of -- and when you say pre-teens,

5    children that had not gone through puberty yet?

6    A    Correct.

7    Q    And typically engaging in sexual acts with adults?

8    A    Correct.

9    Q    After you obtained this person's -- after you obtained the

10   IP information that connected Mr. Cuff to Dreamboard, was his

11   user name on Dreamboard, at least one of them DD0040?

12   A    Yes.

13   Q    And were you able to find that he had a email address that

14   had that same name?

15   A    That same name was an MSN Hotmail email address that was

16   used to register for the board?

17   Q    And did you have occasion to execute a search warrant on

18   that Hotmail DD0040 Hotmail account?

19   A    I did.

20   Q    And when you did that, did you have occasion to -- did you

21   and other agents have occasion to look at the contents of the

22   emails associated with that account?

23   A    Yes.

24   Q    In the email associated with that account, did you find

25   images of Mr. Cuff, the defendant in this case?

1    A    We did.

2    Q    Did you find images of his girlfriend and the children

3    that he was living with?

4    A    Yes.

5    Q    Did you find notations about Dreamboard?

6    A    One email notating Dreamboard.

7    Q    Did you also find notations where he had applied to

8    another child pornography bulletin board?

9    A    Yes.

10   Q    Did you also find emails where he discussed his

11   occupation, that is, his occupation in the military?

12   A    Yes.

13   Q    Based on all of that, were you satisfied that the

14   defendant in this case was DD0040 on Dreamboard?

15   A    Yes.  There were also IP's from the ISP provider, MSN,

16   that came back to Mr. Cuff.

17   Q    The same IP's as the ones he used on Dreamboard?

18   A    Same IP that was used to log into Dreamboard was used to

19   log in to the MSN account where all his identifiers were found.

20   Q    So we were able to tie him not only with his IP's but also

21   with his email account, also images he had sent on his email

22   account, and also notation about Dreamboard?

23   A    Correct.

24   Q    DD0040 on Dreamboard, did he join that board approximately

25   March 22, 2009?

```
 1   A      Correct.

 2   Q      Approximately how many posts did he make?

 3   A      43.

 4              THE COURT:  How many?

 5              THE WITNESS:  43.

 6              THE COURT:  All right.

 7   BY MR. WALKER:

 8   Q      And where did he post to, primarily?

 9   A      The PT Vid section.

10   Q      Did you have occasion, at least in the past, to look at

11   the different types of things he was posting?

12   A      Yes.

13   Q      Typically, were they images of young children?

14   A      Yes.

15   Q      And were they engaged in sex acts with adults --

16   A      Yes.

17   Q      -- adult men.

18          Did we have occasion, did Homeland Security have occasion

19   to execute a search warrant in connection with his arrest?

20   A      Yes.

21   Q      And when they executed a search warrant, did they find,

22   among other things, hard drives?

23   A      Yes.

24   Q      Has somebody had occasion to look at those hard drives?

25   A      Yes.
```

1  Q     And in looking at those hard drives, was child pornography

2  found on the hard drives?

3  A     Yes.

4  Q     Which would be consistent with what he was posting on

5  Dreamboard?

6  A     Correct.

7  Q     Did you also find child pornography that he had produced?

8  A     Yes.

9  Q     Did you find a video that he produced with his

10  girlfriend's five year old daughter?

11  A     Yes.

12  Q     And can you tell the Court what he was doing with the

13  child?

14  A     He was performing oral sex on her and the child was

15  performing oral sex on him.  He was trying to penetrate her

16  vaginally.  She was -- anything you could possibly think of.

17  Q     Did he -- did at one point she express discomfort with

18  what he was doing?

19  A     Yes.

20          THE COURT:  And how old was she?

21          THE WITNESS:  I believe she's six right now and five

22  during the time of the video.

23  BY MR. WALKER:

24  Q     How were you able to identify that he was the person in

25  the video?

1    A     He was standing in front of the video.  As begin to

2    undress, you could see him -- he was standing behind a bed, so

3    you could see him from his knees all the way to the top of his

4    head.  There was another time when he was on the bed and he

5    looked directly at the camera, at the video, as he was going

6    between her leg -- putting his face between her legs.

7    Q     So he was performing oral sex on her?

8    A     Yes.

9    Q     And you could observe his complete frontal face as he was

10   engaging in that act with the child?

11   A     Complete face.

12   Q     When you observed the video, did it appear that this was

13   the first time that he had engaged in acts with this child?

14   A     No.

15   Q     And why do you say that?

16   A     During the majority of the video, the child looked

17   comfortable with him.  She was in distress a couple of times

18   when he tried to, looked like he tried to digitally penetrate

19   her, and then he was trying to penetrate her with his penis;

20   she seemed uncomfortable.  But the rest of the video, she

21   seemed -- her facial expression seemed comfortable with him,

22   that she'd been around him quite a bit and had probably been

23   through this before.

24   Q     Did it also appear that she knew how to perform oral sex

25   on him --

```
 1   A     Yes.

 2   Q     -- as if that had been something that she had done in the

 3   past?

 4   A     Yes.  And he was also verbally instructing her on what to

 5   do throughout the video.

 6   Q     And does this the video in fact have sound so you can

 7   listen to him talk while he's engaging in these acts?

 8   A     Yes.

 9            MR. WALKER:  I would tender the witness, Your Honor.

10            THE COURT:  All right.  Do you want to take a moment

11   to visit with counsel before the cross-examination or do you

12   want to do that after?

13            MR. KARNS:  If I could have second to consult with my

14   client.

15            THE COURT:  Sure.  Take as much time as you need.

16            MR. WALKER:  And, Your Honor, I'm just going to stand

17   over here so he has some privacy.

18            THE COURT:  All right.

19     (Defendant and counsel confer 3:02:05 p.m. to 3:02:58 p.m.)

20            MR. KARNS:  Sir, we're prepared to move forward

21   without the need to see the video.

22            THE COURT:  All right.

23            MR. KARNS:  May I approach the podium, sir?

24            THE COURT:  Yes, please.

25                          CROSS-EXAMINATION
```

1    BY MR. KARNS:

2    Q    Ma'am, you made reference to an email address with the

3    identifier of DD0040; is that right?

4    A    Yes.

5    Q    What email address is that?

6    A    That's the email address that he used to register at the

7    board.

8    Q    Okay.  Are you positive that there were images that were

9    sent using that email address or receiving images using that

10   email address?

11   A    No child pornography in the email.  There were like just

12   snapshots of the little girl and him and his girlfriend.  It

13   was not child pornography.

14   Q    Okay.  Now with regard to there was a search of his home

15   or barracks?

16   A    Yes.

17   Q    As well as a search of his office?

18   A    Correct.

19   Q    Okay.  Were there search warrants for each?

20   A    I don't believe there was a search warrant for the office.

21   I'm not completely sure of that.

22   Q    Okay.  Now there was no child pornography found in his

23   home; is that right?

24   A    To my knowledge, not sure of that.  They're still working

25   on all of the media at this point.

1    Q    Okay.  Have you spoken with Mr. Walker about that?

2    A    Yes.

3    Q    Okay.  And have you heard him say that there was no images

4    of child pornography found on the drive?

5              MR. WALKER:  For clarity's sake, Your Honor, I feel

6    like as a -- in talking to him, I gave him the best information

7    I had.

8              THE COURT:  All right.

9              MR. WALKER:  So I actually was not at the scene of

10   the search either, so I just want to make it clear, based on

11   the way (inaudible) --

12             MR. KARNS:  Sure.  No --

13             THE COURT:  All right.  What I understand is that you

14   don't know whether there was or not, but as you sit here

15   today --

16             MR. WALKER:  It's my belief.

17             THE COURT:  -- it's your belief that there was not.

18             MR. KARNS:  Right.  And that's what I'm trying to get

19   at.

20             THE COURT:  Okay.

21             THE WITNESS:  As of right now they're still going

22   through all the media.  As of right now, that's --

23   BY MR. KARNS:

24   Q    Okay.  So to be clear, we're not sure if there's any

25   images of child pornography that were found on hard drives or

1   computers, thumb drives, at his house?

2   A     Correct.

3   Q     Okay.  So there is no evidence of child pornography found

4   in his house?

5   A     As of right now.

6   Q     As of right now?  Okay.

7         Now, and with regard to his office, where were the drives

8   found in the office?  Is that what you're saying, that there

9   were drives found at his office that had child pornography on

10  them?

11  A     Correct.  I don't know exactly where in the office they

12  were.  I'd have to review the report.

13  Q     Do you know what they were found on?

14  A     No.

15  Q     Okay.  Whether it was thumb drive --

16  A     It was my understanding it was hard drives, like external

17  hard drives.

18  Q     External hard drives?  Okay.

19        And so was there a search warrant to -- are you aware if

20  the -- when the -- well, the drives were found in his office;

21  is that correct?

22  A     Correct.

23  Q     And do you know if they were government hard drives or

24  they were personal hard drives?

25  A     I don't know.

1    Q    Do you know if there was a search warrant to search the

2    hard drives?

3    A    Do not know that.

4    Q    Now did he make any statements or admissions?

5    A    Did not.

6    Q    And he did not resist arrest?

7    A    No.

8    Q    Now, with regard to there's different levels of membership

9    at Dreamboard; is that right?

10   A    Correct.

11   Q    There's the -- there's VIP and Super VIP; is that right?

12   A    There's member, VIP, Super VIP, Super VIP period, which

13   are their producers and the administrators.

14   Q    Okay.  So there's -- all right; so let me make sure that I

15   understand.  There's member, which would be lowest?

16   A    Right.

17   Q    Okay.  And then the second one moving up?

18   A    VIP.

19   Q    Is VIP?

20   A    VIP.

21   Q    And then the next one would be Super VIP?

22   A    Correct.

23   Q    And then the one after that?

24   A    Super VIP with a period at the end, and that denotes that

25   they are producers on the board.

```
 1   Q    Okay.  And then there's administrators?
 2   A    Correct.
 3   Q    Okay.  But in terms of the levels of membership -- well, I
 4   mean, is there only one administrator?
 5   A    There's five.
 6   Q    What does it mean to be an administrator?
 7   A    They run the board; they -- there's one main administrator
 8   who dictates who belongs to the board and who doesn't.  The
 9   rest of them help manage the board.
10   Q    Okay.  So it sounds like then there's four levels of
11   membership, not including the administrator?
12   A    Right.
13   Q    Okay.  So, and he was VIP?
14   A    Yes.
15   Q    So he would be at the second lowest?
16   A    Yes.
17   Q    But not a producer?
18   A    Correct.
19   Q    Okay.  And what's the difference between Super VIP and
20   then Super VIP period?  Well, I guess I should distinguish
21   between -- we know Super VIP period is a producer?
22   A    Right.
23   Q    Okay.  So what's the difference between VIP and Super VIP?
24   A    Just a higher level of membership.  The more you post, the
25   higher up you can move in membership.
```

 1          THE COURT:  Was it just a numerosity question?  It

 2    was purely a volume question, where somebody would graduate to

 3    the next level from VIP to Super VIP, or did it depend on the

 4    nature of the post?

 5          THE WITNESS:  Based on the intel from the board, just

 6    reading a lot of the admin's rules and what he would say, I've

 7    seen people with hundreds of posts who had not moved up to

 8    Super VIP, and I've seen people with fewer posts who have moved

 9    up.  I think he just selectively -- it's not an automatic

10    thing, once you hit so many posts, you bump up to the next

11    section.  He would choose, pick and choose who would get to go

12    to the next section.

13          MR. KARNS:  Thank you, sir.

14    BY MR. KARNS:

15    Q    Okay.  And so you're not sure if there was a search

16    warrant for the hard drives later confirmed where child

17    pornography was found?

18    A    Correct.

19    Q    Okay.  Is there any other place where there was child

20    pornography found other than those drives that were found in

21    his office?

22    A    Not that I know of?

23    Q    Okay.  The video that you described before with the girl

24    that was living at the house, was that found on those drives

25    that were seized at the office?

1    A    Yes.

2            THE COURT:  What was the -- when you reviewed that,

3    did it have a date stamp on it?

4            THE WITNESS:  It did not have a date stamp on it, but

5    the computer forensics agent, however he pulled it from the

6    hard drive, said that it was made on July 4th of this year.

7            THE COURT:   July 4th of this year?  All right.

8            MR. KARNS:  Thank you, sir.  I don't have any other

9    questions.

10           THE COURT:  All right.  Mr. Walker?

11           MR. WALKER:  I don't have any further questions, Your

12   Honor.

13           THE COURT:  All right.  Agent Williams, you can step

14   down.  Thank you, ma'am.

15       Let's see.  Mr. Walker is there any other information that

16   you wish to present to the Court other than what we have

17   discussed in court today?

18           MR. WALKER:  No, Your Honor.  That's it.

19           THE COURT:  All right.  Mr. Karns, would you like to

20   call any witnesses or present any -- I'll give you a chance to

21   argue if you would like.  Is there any other information or

22   evidence that you would like to present from the witness stand?

23           MR. KARNS:  Not from the witness stand, but, you

24   know, I have a proffer as far as other --

25           THE COURT:  Yeah.  Why don't you just come up to the

 1    lecturn and we'll do that.  And while you're up there, I'll let

 2    you present whatever argument you would like to make as well,

 3    and then I'll have Mr. Walker go next.

 4              MR. KARNS:  Okay.

 5        Thank you, Your Honor.  With regard to the presumption --

 6    and the Defense stipulates that the presumption applies in this

 7    case; however, it is a presumption that can be rebutted.  And

 8    that's what's happened here today.  I would like -- there's a

 9    lot of the information I want to make in terms of the proffer.

10    And I assume this is going to make a combination

11    proffer/argument, Your Honor.

12              THE COURT:  Oh sure, sure.  Yeah.  Would you pull

13    your mic a little bit closer to you.  And I'll turn it down if

14    need be.

15              MR. KARNS:  Yes, sir.

16              THE COURT:  All right.

17                          CLOSING ARGUMENT

18    BY MR. KARNS:

19        Okay.  As far as the presumption goes, it has been

20    overcome in this case, and now the burden of proof has shifted

21    to the Government to prove that he's a flight risk or a danger

22    to the community.  And as far as the flight risk standard,

23    that's by a preponderance of the evidence.  And as you know,

24    for --

25              THE COURT:  And I have very little concern about

 1    flight risk.

 2              MR. KARNS:  Okay, sir.

 3              THE COURT:  I've read enough about his background

 4    where I'm not as concerned.  That's not what I'm up here

 5    worrying about right now.

 6              MR. KARNS:  Yes, sir.  So that would leave danger to

 7    the community, which the standard would be "by clearing and

 8    convincing evidence."  That this, from this point forward, that

 9    he would be a danger to the community and that the, you know,

10    the Government obviously has to prove that there are no

11    conditions or a combination of conditions that can be

12    reasonably imposed -- excuse me -- that can be imposed and

13    reasonably assure that Mr. Cuff would not be a danger to the

14    community.  In this case, from this point moving forward, there

15    are conditions that can be imposed or a combination of

16    conditions that can be imposed.  And pretrial services has

17    pointed those out as far as, you know, electronic monitoring,

18    you know, restrictions on travel.  In their recommendation,

19    they talk about, you know, obviously refraining from a firearm,

20    possession of a firearm, comply with a, you know, curfew.  And

21    this is from pretrial services.

22              THE COURT:  I see it.

23              MR. KARNS:  -- at Fort -- it was originally conducted

24    at Fort Bliss.  And, you know, they recommended a, you know,

25    $20,000 cash bond -- or excuse me -- a cash bond with the

1  required deposit of 10 percent.

2      You know, his character letters, you know, speak to his,

3  not only long-standing duty performance, but integrity.  And

4  you don't get to the rank and the level of responsibility that

5  he achieved without having the utmost integrity and

6  truthfulness and candor towards the leaders that he was in

7  charge of advising, as well as the troops that he was in charge

8  of leading.

9      And he is, you know, it's probably pretty rare that you'll

10  see a case like this, but, you know, since he's -- he's 48 now.

11  He's had the same job since he was 20 years old.  So as far as

12  consistency with employment, that's 28 years that he has had an

13  outstanding duty performance.

14      THE COURT:  And the letters are full of information

15  about his traveling overseas and providing assistance in

16  Somalia and in other far-away places.

17      MR. KARNS:  Yes, sir.  To some very, you know,

18  impoverished, you know, peoples and serving as a, you know,

19  ambassador to our country as well is just outright, you know,

20  helping people.  And so with that consistency, this point

21  moving forward, I think it's very reasonable to assume and that

22  the conditions that you can impose or a combination of

23  conditions that you can impose, would keep the community safe.

24      He's been married to the same woman for 24 years.  His son

25  serves as a Security Forces officer in the Air Force, which is

1    equivalent of a police officer.  His daughter is married to a

2    sailor.  You have letters from his daughter as well as his

3    son-in-law, his wife, in-laws, former colleagues.  The rank he

4    has achieved is the highest enlisted rank that you can achieve

5    in any military branch, as well as serving in the highest

6    capacity in that rank as a command, you know, master chief.

7    The nature of his employment is such that if he doesn't report,

8    his employer will report him as being AWOL.  So it's

9    essentially a crime for him to not show up to work, whereas,

10   other accused that may come in here may not get reported by

11   their employer.  His employer will report him if he does not

12   show up to work, and has the power to issue a warrant for his

13   arrest.

14       He has a motive to not get in trouble any more.  By being

15   retirement eligible, he's retirement eligible at 20, but his

16   retirement is not vested.  So any misconduct that he would

17   engage in, whether it be the conduct that he's accused of here

18   or any conduct moving forward, could cause him and his wife to

19   loose, you know, his or their retirement.  So, he has every

20   incentive to be on his best behavior if he's released, because

21   even if he were to be found guilty or plead guilty in this case

22   and get confinement, prison time, he would be eligible to

23   receive a check after he gets out.  So if he serves, you know,

24   a number of years in this case, he has something to look

25   forward to.  Assuming that the military gives him his

1    retirement, you know, they don't take his retirement away.

2              THE COURT:  Right.

3              MR. KARNS:  And that's what he would be shooting for,

4    you know, by, you know, if he were to be released, that he has

5    something very important to look forward to because that

6    retirement's not vested.  It's not like he's got a 401(k) plan

7    that he's allowed to tap into at any given time.  That this is

8    a big question mark that's, you know, something that's hanging

9    over his head that gives him a big incentive to stay out of

10   trouble.

11        He obviously has no criminal history.  He wasn't on

12   probation or parole during the time period of this alleged

13   offense.  He's got the, you know, the physical condition and

14   mental condition, you know, fortitude to do what's right in

15   terms of, you know, not harming the community, as well as

16   returning.

17        So, you know, for those reasons, as well as, Your Honor,

18   it doesn't appear that there is any child pornography, there

19   has been no child pornography discovered at his house.  The

20   pornography that was discovered on the hard drives, there's no

21   evidence that there was a search warrant to obtain, to search

22   his personal hard drives.

23        And so for those reasons, Your Honor, we believe that

24   there is a combination or conditions or combination of

25   conditions that would adequately serve to protect the

 1   community.  Therefore we ask for you to follow the

 2   recommendation in the pretrial services report.

 3            THE COURT:  All right.  Thank you, Mr. Karns.

 4            MR. KARNS:  Thank you.

 5            THE COURT:  Mr. Walker?

 6                        CLOSING ARGUMENT

 7   BY MR. WALKER:

 8       First, the evidence against the defendant is overwhelming.

 9   The evidence that he was a member of this board is

10   overwhelming.  We have more evidence against this defendant

11   being a member of this board than we have of anybody else.  And

12   we took it very seriously because of who he was.  We have not

13   only IP information proving it; we've got his -- we went and

14   got his email address where we've got pictures of him and him

15   talking about Dreamboard.  We also have him not only being a

16   member of Dreamboard, we have him being a member of Dreamboard

17   and another child pornography bulletin board at the same time.

18       The Defense talks about candor.  I think what is

19   absolutely clear is that this defendant is living two lives.

20   He has the life which is his official life, his government

21   life, and then he has this other life, the life where he's

22   uploading hard core, pre-pubescent child pornography.  He's

23   uploading videos of children being sexually abused.

24       As you heard, he was uploading to the PT Vid section.

25   That's the videos of children being sexually abused.  And you

1    heard the ages of the children, young children.

2        When they execute the search warrant, what do they find?

3    They find that he's been actively molesting his girlfriend's

4    child, and he videotaped it.  And you also heard from the agent

5    that it absolutely appeared it wasn't the first time because he

6    had been teaching this child how to be a victim over time.  She

7    knew what to do because he'd taught her what to do.

8            THE COURT:  Was the video of the girlfriend's

9    daughter uploaded or was it just on the hard drive?

10           MR. WALKER:  We don't know.  He uploaded child

11   pornography onto the computer -- I mean, we can see what he

12   uploaded on to Dreamboard.  The problem is:  On Dreamboard, as

13   the Court well knows, you take individual images out of a

14   video, and so you can see individual images but you can't see

15   the video because it's stored some place else.  I looked at the

16   images.  I saw images that look like the girl, but I can't say

17   it's the girl; I can only say it's children that looks like the

18   girl.

19       So when you look at this person, you're looking at a

20   person who clearly has had two completely different lives.  He

21   talks about candor.  If the general had known or if anybody had

22   known what he was doing, he would absolutely be out.  He talks

23   about the fact that he's been married 24 years and talking

24   about candor.  He's been married 24 years, but at the time that

25   this happened, his wife was living in another state, he was

 1   living with his girlfriend and molesting her daughter.  That
 2   just doesn't sound like candor to me.
 3       The Defense also talks -- and this is a disturbing thing
 4   and it's just, I only note it based on everything else that
 5   we've seen in this case.  He talks about the fact that there
 6   are letters -- and I haven't read them and it's not the
 7   Defense's fault; it's actually I could have spent more time
 8   reading them.  I didn't ask to.  But he talks about the fact
 9   that this guy has been traveling to third world countries and
10   going there apparently repeatedly for a long period of time.
11       That's been a recurring theme in this case.  The people
12   who are producing are traveling to third world countries all
13   the time.  And some of them have sterling records when they
14   travel to those third world countries and many of them are
15   doing things to children in those third world countries.
16       You know, the evidence in this case is overwhelming.  The
17   fact, though he's not a producer on the board, he hasn't been
18   elevated, but he is producing child pornography, puts him in a
19   completely different category than most of the other people who
20   have been before this Court.  And I think detention is the only
21   justified decision.
22           THE COURT:  All right.  Mr. Karns, anything further?
23                       REBUTTAL ARGUMENT
24   BY MR. KARNS:
25       Sir, I'd just point out that he is a -- I think the

1    Government clarified it, that he was a member of -- he was a

2    VIP member, which makes him a non-producer, and so at least the

3    board -- if you assume that he is a member, a VIP, at least the

4    board administrator didn't believe that he was a producer.  His

5    image wasn't -- his face wasn't visible in there (inaudible).

6                 THE COURT:  All right.

7                 MR. KARNS:  Thank you.

8                 THE COURT:  The Court has reviewed the pretrial

9    services report.  I'm familiar with the case, as y'all are,

10   having executed the arrest warrant with the criminal complaint

11   to it.  I've also read the many letters of reference that were

12   sent from brigadier generals, captains, other command master

13   chiefs, family members, his wife, his son, his daughter, his

14   daughter-in-law.  And as the evidence was being presented to me

15   today and the description of the video of Mr. Cuff sexually

16   abusing the five-year-old, now six-year-old, I couldn't get the

17   image of Dr. Jekyll and Mr. Hyde out of my head.  And Mr.

18   Walker hit on that when he said the gentleman was leading two

19   lives.

20       There is absolutely no way that the Court will let Mr.

21   Cuff out on any kind of bond with any kind of conditions.  He

22   is a child abuser, a child molester, and he records his

23   criminal acts by video.  And there is clear and convincing

24   evidence of his participation in the conspiracy and in the

25   enterprise that I have heard summaries of today.

1    The Court finds that the presumption in favor of detention

2  has not been rebutted, but even setting aside the issue of the

3  presumption, Court finds by clear and convincing evidence that

4  the release of Mr. Cuff on any kind of bond or any kind of

5  conditions would create a gross and unacceptable risk of danger

6  to the most vulnerable among us in our community.  So the

7  Government's motion for detention is granted.

8    Mr. Karns, I compliment you on the excellent job that you

9  did for your client.  You raised some excellent points.  When

10  the recommendation was made by probation I think in the Western

11  District of Texas, they didn't have all the information that we

12  have today and the Court finds itself bound to reject the

13  recommendation that was made by that pretrial services officer

14  who did not know what we now know.

15    Mr. Cuff is ordered to the custody of the United States

16  Marshall pending further proceedings in the case.  We've got

17  future deadlines.  I believe that's all we need to take up, so

18  court is adjourned.

19                    (End of proceedings, 3:24 p.m.)

20

21

22

23

24

25

1                          CERTIFICATE

2          I, Richard A. Simpson, certify that the foregoing pages

3     numbered 1 through 33 do constitute a true and correct

4     transcription from the official electronic sound recording of

5     the proceedings in the above-entitled matter, to the best of my

6     ability and understanding.

7          I certify that the transcript fees and format comply with

8     those prescribed the Court and the Judicial Conference of the

9     United States.

10         Subscribed and sworn to this 29th day of February, 2012.

11

12

13    _____        /s/Richard A. Simpson
                                          Richard A. Simpson
14                                        Transcriber
                                          1120 Hallmark Dr.
15                                        Shreveport, Louisiana 71118
                                            (318) 688-1860
16

17

18

19

20

21

22

23

24

25